741 P.2d 840

**MORRIS OIL COMPANY, INC.,**
Plaintiff-Appellee,

v.

**RAINBOW OILFIELD TRUCKING, INC., Defendant,**

**and**

**Dawn Enterprises, Inc.,**
Defendant-Appellant.

No. 8646.

Court of Appeals of New Mexico.

July 28, 1987.

Don Maddox, Maddox, Renfrow & Saunders, Hobbs, for plaintiff-appellee.

J. Kevin Hale, Hynes & Hale, Farmington, for defendant-appellant Dawn Enterprises, Inc.

## OPINION

GARCIA, Judge.

This appeal comes before this court for decision after the case was submitted to an advisory committee pursuant to an experimental plan. *See Patterson v. Environmental Improvement Div.*, 105 N.M. 320, 731 P.2d 1364 (Ct.App.1986); *Stoll v. Dow*, 105 N.M. 316, 731 P.2d 1360 (Ct.App.1986); *Boucher v. Foxworth-Galbraith Lumber Co.*, 105 N.M. 442, 733 P.2d 1325 (Ct.App. 1986). The committee rendered a unanimous decision and the parties were so notified. Only Dawn Enterprises Inc. (Dawn) filed a response memorandum. This court has considered the transcript and briefs in this case, together with the opinion of the advisory committee and Dawn's response thereto. It is the decision of this court that the opinion of the advisory committee

should be adopted, in modified form, as follows.

Defendant Dawn appeals from the judgment rendered against it in favor of Morris Oil Company, Inc. (Morris), based upon a determination that Rainbow Oilfield Trucking, Inc. (Rainbow) was Dawn's agent when it incurred indebtedness with Morris. We affirm the trial court.

## FACTS

Appellant Dawn, the holder of a certificate of public convenience and necessity, is engaged in the oilfield trucking business in the Farmington area. Rainbow was a New Mexico corporation established for the purpose of operating an oilfield trucking business in the Hobbs area. Defendant corporations entered into several contracts whereby Rainbow would be permitted to use Dawn's certificate of public convenience and necessity in operating a trucking enterprise in Hobbs. Dawn reserved the right to full and complete control over the operations of Rainbow in New Mexico. Dawn was to collect all charges due and owing for transportation conducted by Rainbow and, after deducting a $1,000 per month "clerical fee" and a percentage of the gross receipts, was to remit the balance to Rainbow. Under a subcontract entered into by defendants, Rainbow was to be responsible for payment of operating expenses, including fuel; further, the subcontract provides that all operations utilizing fuel were to be under the direct control and supervision of Dawn. All billing for services rendered by Rainbow would be made under Dawn's name, with all monies to be collected by Dawn.

Defendants also entered into a terminal management agreement which provided that Dawn was to have complete control over Rainbow's Hobbs operation. The agreement further recited that Rainbow was not to become the agent of Dawn and was not empowered to incur or create any debt or liability of Dawn "other than in the ordinary course of business relative to terminal management." The agreement recited that Rainbow was to be an independent contractor and not an employee, and that liability on the part of Rainbow for creating charges in violation of the agreement would survive the termination of the agreement. Dawn was to notify Rainbow of any claim of such charges whereby Rainbow would assume the defense, compromise or payment of such claims.

Rainbow operated the oilfield trucking enterprise under these contractual documents, during which time Rainbow established a relationship with plaintiff Morris, whereby Morris installed a bulk dispenser at the Rainbow terminal and periodically delivered diesel fuel for use in the trucking operation. The enterprise proved unprofitable, however, and Rainbow ceased its operations and ultimately declared bankruptcy, owing Morris approximately $25,000 on an open account.

When Morris began its collection efforts against Rainbow, it determined that Rainbow had ceased its operations, everyone associated with Rainbow had moved back to Texas and it did not appear likely that the account would be paid. Morris was directed by Rainbow's representative in Texas to Dawn for payment of the account.

When Rainbow ceased its operations, Dawn was holding some $73,000 in receipts from the Hobbs operation. Dawn established an escrow account through its Roswell attorneys to settle claims arising from Rainbow's Hobbs operation. When Morris contacted Dawn with regard to the outstanding account, it was notified of the existence of the escrow account and was asked to forbear upon collection efforts, indicting that payment would be forthcoming from the escrow account. Dawn's representatives indicated that it was necessary to wait for authorization from Rainbow's parent Texas corporation before paying the account. At no time did Rainbow or Dawn question the amount or legitimacy of Morris' open account balance.

Dawn's principal further testified that the subcontract and terminal management agreement were cancelled by Dawn when he learned that Rainbow was incurring debts in Dawn's name. The charges owing to Morris, however, were incurred in the name of Rainbow and not Dawn.

Although some claims were paid from the attorneys' escrow account established by Dawn, there was no explanation at trial why the Morris claim was not paid. When Morris learned that the escrow funds had been disbursed without payment of its charges, it instituted this action and also sought to garnish the remaining $13,000 held by Dawn from the impounded funds. Rainbow did not defend, and the trial court entered a default judgment against Rainbow, from which it does not appeal.

## DISCUSSION

The trial court found that Dawn retained the right to direct control and supervision of Rainbow's New Mexico operations, and that in the course of those operations, Rainbow incurred a balance of almost $25,000 on an open account with Morris for fuel used in the New Mexico operations. The trial court further found that when Rainbow defaulted on payments on Morris' account, Dawn made representations over a period of time concerning the existence of a fund held by Dawn to settle indebtedness created by Rainbow operating under the subcontract. The court determined that Morris delayed its collection efforts pending disbursement of the funds, and that Dawn was aware that Morris was relying upon Dawn's representations that payment would be made from the impounded fund. The trial court concluded that Rainbow was at all times in its dealings with Morris the agent of Dawn and, therefore, Dawn was responsible for the account balance.

■ Dawn urges one point of error on appeal; that the trial court erred in finding liability based on a principal-agent relationship between the defendants. Dawn relies upon the language in the terminal management agreement which states:

4. Rainbow is not appointed and shall not become the agent of Dawn and is not empowered to incur or create any debt or liability of Dawn other than in the ordinary course of business relative to terminal management. Rainbow shall not enter into or cause Dawn to become a party to any agreement without the express written consent of Dawn.

5. Rainbow shall be considered an independent contractor and not an employee of Dawn.

Dawn's reliance upon these paragraphs of the agreement is unpersuasive for two reasons. First, the agreement specifically states that Rainbow may create liabilities of Dawn in the ordinary course of business of operating the terminal. There is no question that the liability to Morris was incurred in the ordinary course of operating the trucking business. Second, the recitation of the parties in their contractual documents need not bind third parties who deal with one of them in ignorance of those instructions. *See South Second Livestock Auction, Inc. v. Roberts,* 69 N.M. 155, 364 P.2d 859 (1961); *see also Great Northern R.R. Co. v. O'Connor,* 232 U.S. 508, 34 S.Ct. 380, 58 L.Ed. 703 (1914).

While Dawn argues from cases discussing apparent authority, we view this as a case of undisclosed agency. Rainbow contracted in its own name and not in the name of Dawn Enterprises, Inc. Thus, this case involves concepts relating to undisclosed agency rather than to apparent authority, and is governed by principles of undisclosed principal-agent contracts. *See, e.g.,* 3 Am.Jur.2d *Agency* § 316 (1986).

■ It is well established that an agent for an undisclosed principal subjects the principal to liability for acts done on his account if they are usual or necessary in such transactions. *Restatement (Second) of Agency* § 194 (1958). This is true even if the principal has previously forbidden the agent to incur such debts so long as the transaction is in the usual course of business engaged in by the agent. *Id.*

The indebtedness in the instant case is squarely governed by well-established principles of agency where an undisclosed principal entrusts the agent with the management of his business. The undisclosed principal is subject to liability to third parties with whom the agent contracts where such transactions are usual in the business conducted by the agent, even if the contract is contrary to the express directions of the principal. *Restatement (Second) of Agency* § 195 (1958).

■ Dawn's reliance upon *Bloodgood v. Woman's Ben. Ass'n*, 36 N.M. 228, 13 P.2d 412 (1932) is misplaced. Indeed, the case stands for the proposition that a principal may limit an agent's authority, and further, that the limitation will be binding upon a third party dealing with the agent *if the third party has knowledge of the limitation of authority.* Here there is no evidence that Morris had any actual knowledge of the existence of the Rainbow-Dawn agency, let alone any claimed limitations by Dawn on Rainbow's authority. It is undisputed that Morris thought it was dealing solely with Rainbow when it sold fuel.

■ Morris correctly observes that secret instructions or limitations placed upon the authority of an agent must be known to the party dealing with the agent, or the principal is bound as if the limitations had not been made. *Chevron Oil Co. v. Sutton*, 85 N.M. 679, 515 P.2d 1283 (1973).

■ Dawn argues that Morris had constructive notice of the alleged limitations because the subcontract between the defendants was filed with the Corporation Commission. The filing of the subcontract does not constitute constructive notice to all third parties of an alleged limitation on an agent's authority. As stated in NMSA 1978, Section 65–2–81 (Repl.Pamp.1981), the public policy requiring a filing with the Corporation Commission is to implement the transportation policy of the State of New Mexico in furtherance of regulation of common carriers using the state's highways. The statutes governing common carriers do not state or imply that the filing of documents with the Corporation Commission constitutes constructive notice to all prospective creditors of the specific agency relationship between parties. The mere filing of a document with a public office does not constitute constructive notice of the contents of the document to the public unless the person to be charged with notice should reasonably anticipate that the information will be contained in the documents filed. *See Jaquith v. Smith*, 112 Vt. 353, 24 A.2d 341 (1942); *cf.* NMSA 1978, § 14–9–2 (in real estate transactions, a recorded instrument provides constructive notice of its contents). We are not at liberty to supplement the statutory scheme the legislature has provided by adding such a provision.

Finally, Dawn asserts that Morris has made an election to hold Rainbow liable as the agent, and has taken judgment against it. Dawn argues that because Morris has made this election, it cannot now hold Dawn liable.

■ In *Amortibanc Inv. Co. v. Rampart Associated Management, Inc.*, 6 Kan. App.2d 227, 231, 627 P.2d 389, 394 (1981), the Kansas appellate court succinctly explained the law in this area:

(1) Where a third party enters into a contract with an agent for an undisclosed principal, the third party, upon discovery of the agency, may bring action against both principal and agent. (2) Once the agency has been established, either by admission or by evidence, the third party may be required to elect whether to proceed against the principal or the agent. (3) The right to *compel* an election belongs to the principal and the agent, though the right to *make* an election belongs to the third party. (4) If no motion to compel an election is made in the trial court before judgment is entered against either principal or agent, then the matter of election is waived. (5) A judgment on a single contract, entered against both principal and agent, will support but a single recovery. In other words, satisfaction of the judgment by either principal or agent extinguishes the judgment against the other. [Emphasis in original.]

In this case, Dawn did not assert the right to compel an election at trial. For this reason, we consider any right was waived. *See Doe v. City of Albuquerque*, 96 N.M. 433, 631 P.2d 728 (Ct.App.1981). Additionally, we think it consequential that Dawn was in possession of the proceeds owing to Rainbow. Dawn was the entity making the decisions as to which creditors would be paid. While there were apparently sufficient funds to pay the amount owed to Morris on Rainbow's open account among Rainbow's proceeds, Dawn chose not to pay

Morris, and in fact, to deduct some $25,000 of the proceeds as its own "clerical fee." In light of Dawn's control over Rainbow's proceeds, we decline to recognize Dawn's right to compel an election in this matter.

Moreover, assuming *arguendo* that Dawn was not responsible for the indebtedness to Morris for the reasons urged on appeal, it is clear that Dawn ratified the open account after learning of its existence when Morris contacted Dawn regarding payment. A principal may be held liable for the unauthorized acts of his agent if the principal ratifies the transaction after acquiring knowledge of the material facts concerning the transaction. *Ulibarri Landscaping Material, Inc. v. Colony Materials, Inc.,* 97 N.M. 266, 639 P.2d 75 (Ct.App.1981).

It was undisputed that in several telephone conversations between the principals of Dawn and Morris, the material facts of the Morris open account were disclosed to Dawn. At no time did Dawn dispute the legitimacy or amount of the open account, and indeed assured Morris that payment would be forthcoming from the funds retained from Rainbow's revenues. Despite this, Dawn used the fund to pay itself a $1,000 per month clerical fee, to pay legal fees incurred as a result of its agency with Rainbow and to settle other claims arising from the Rainbow operations. Where the principal retains the benefits or proceeds of its business relations with an agent with knowledge of the material facts, the principal is deemed to have ratified the methods employed by the agent in generating the proceeds. *See id. See also* 3 Am.Jur.2d *Agency* § 194 (1986). The diesel fuel provided by Morris was used in Rainbow's trucking operation. Dawn collected the receipts due to Rainbow. Dawn seeks to retain the benefits of the agency with Rainbow, and yet at the same time disclaims responsibility for the business of the agent by which the benefits were generated. This it cannot do. *Ulibarri Landscaping Material, Inc. v. Colony Materials, Inc.*

In sum, for the foregoing reasons, we affirm.

IT IS SO ORDERED.

This court acknowledges the aid of attorneys Chris Key, Thomas B. Stribling, III and Geoffrey D. Rieder in the preparation of this opinion. These attorneys constituted an advisory committee selected by the Chief Judge of this court, and we express our gratitude to them for their voluntary service and for the quality of their work.

BIVINS and MINZNER, JJ., concur.