### In re HUNT'S PIER ASSOCIATES, Debtor.

Civ. A. No. 93–3500.
Bankruptcy No. 91–15644S.

United States District Court,
E.D. Pennsylvania.

Dec. 20, 1993.

444

---

### MEMORANDUM AND ORDER

YOHN, District Judge.

#### INTRODUCTION

On May 20, 1993 the bankruptcy court allowed Baumgardner Construction Co. ("the Company") a general unsecured claim in the amount of $1,089,029.00 ("the Claim") against Hunt's Pier Associates, a general partnership ("the Debtor"). 154 B.R. 436. The Debtor's appeal from the order of the Honorable David A. Scholl is now before this court

pursuant to 28 U.S.C. § 158. For reasons stated herein, the court will affirm the decision of the bankruptcy court.

## BACKGROUND

Since its formation, the Debtor has been plagued by disputes among its partners. Attempts by the partners to settle those disputes have created most of the issues which the court must now resolve. Chronicled below are those aspects of the Debtor's history, including the partners' attempts to settle their disputes and the Debtor's dealings with the Company, that are pertinent to the court's resolution of the issues presented.[1]

The Debtor was formed in June, 1985 as a general partnership between David Kami, Theodore Snyder, Leon Silverman and Elias Stein. On August 16, 1985 the Debtor entered into an asset purchase agreement ("the Purchase Agreement") with Hunt's Theaters, Inc. which provided that the Debtor would purchase certain real estate holdings and other interests in and around Wildwood, New Jersey. These real estate holdings included "Hunt's Pier," an amusement pier platform and deck, including all rides, vehicles, theater equipment, inventory, equipment and supplies, located in Wildwood ("the Pier").

In February of 1986, the Debtor borrowed ten million dollars from Atlantic Financial Federal ("AFF") to finance the acquisition of the Pier and the other assets. As collateral for the loan, the Debtor granted AFF a first mortgage on all the assets acquired under the Purchase Agreement. As additional security AFF was given "a first priority lien and security interest in all Accounts, Equipment, General Intangibles and Inventory ... now owned or hereafter acquired by the [Debtor]."

Following consummation of the Purchase Agreement, the Debtor began to manage and operate the acquired properties and assets. Shortly thereafter, however, discord developed among the partners, resulting in protracted litigation that has plagued the Debtor ever since. One attempt at resolution of those disputes—a settlement whereby Kami, and Silverman and Stein (hereinafter "S & S"), agreed to redeem Snyder's interest in the Debtor—underscores the controversies presented herein.

Following Snyder's withdrawal from the Debtor, the remaining partners entered into a letter agreement on July 8, 1988 ("the July Agreement") the purpose of which was to (1) reflect the agreement regarding the redemption of Snyder's interest in the Debtor; (2) describe the manner in which income, losses, and existing capital accounts would be accounted for and allocated among Kami and S & S as a result of the redemption of Snyder's interest; and (3) provide the terms and conditions for the Debtor's restructuring and ultimate dissolution.[2]

Pursuant to the terms of the July Agreement, Kami was allocated thirty-seven percent (37%) and S & S sixty-three percent (63%) of the Debtor's profits and losses as of the close of business on July 7, 1988. (Appellant's Appendix ("App.") at 944.) Additionally, Kami was apportioned seventy-five percent (75%) and S & S twenty-five percent (25%) of the Debtor's existing indebtedness which included the amount to be paid Snyder ($2.3 million) and the remaining balance on the AFF Loan ($7 million). *Id.*

The July Agreement restructured the partnership in the following manner as of July 8, 1988: Kami was given the exclusive

---

1. The Debtor's tumultuous history and prior bankruptcy proceedings are described in greater detail in both a prior opinion by Judge Scholl in a related action, *In re Hunt's Pier Associates*, 143 B.R. 36 (Bankr.E.D.Pa.1992) (*"Hunt I"*) and his opinion below in this action, *In re Hunt's Pier Associates*, 154 B.R. 436 (Bankr.E.D.Pa.1993) (*"Hunt II "*).

2. The first paragraph of the July Agreement states:

 The purpose of this letter is to set forth in writing the general terms of an agreement that

has been reached among the three of you [Kami, Silverman, and Stein] with respect to the redemption by Hunt's Pier Associates of Ted Snyder's interest in the partnership, the manner in which items of income and loss and existing capital accounts will be accounted for and allocated among the three of you as a result of this redemption, and the terms and conditions under which the partnership is to be restructured and ultimately dissolved. (Appellant's Appendix ("App.") at 942.)

right to manage and operate both the Pier and some adjacent properties of the Debtor (the "Ocean Block").[3] S & S were given the exclusive right to manage and operate the other property and assets of the Debtor acquired under the Purchase Agreement. Kami and S & S were to be allocated the "benefits and burdens of all profits and losses" related to their respective properties. Kami and S & S were entitled to use all "revenues relating to or arising out of the operation of their respective properties without interference from the other," subject to the restriction that they "comply in all respects with the provisions of the AFF and Snyder [indebtedness]." (App. at 946.)

The July Agreement prohibited Kami and S & S from incurring "any indebtedness for which the other (or the respective properties allocated to them ...) [would] be liable in connection with the operations of their respective properties." (App. at 948.) Additionally, it contained a provision whereby Kami and S & S agreed to indemnify each other for any losses or damages of any kind arising out of or relating to the operation of their respective properties.[4]

The July Agreement anticipated that an amended and restated partnership agreement would subsequently be prepared which would flesh out the terms contained in the July Agreement and provide additional warranties and representations. (App. at 949.) Such a later agreement was entered into in the form of a letter agreement on October 18, 1988 ("the October Agreement"). Although the terms of the October Agreement superseded those of the July Agreement, they did not substantively alter any of the pertinent provisions of the July Agreement. *Hunt II* at 440.

Following the execution of the July and October Agreements ("the Letter Agreements"), Kami and S & S began to manage and operate their respective properties. During the summer of 1988, Kami experienced difficulty paying his seventy-five percent (75%) share of the Debtor's indebtedness because the Pier did not generate sufficient income. For this reason, following the summer season of 1988, he sought permission from S & S to erect a roller coaster ("the Ride") on the Pier, with the hope that it would generate sufficient additional revenue so that he could satisfy his share of the Debtor's obligations. S & S expressly granted Kami permission to erect the Ride. *Hunt II* at 440, 446.[5] To facilitate the financing of the Ride, on January 17, 1989, the Debtor, through the unanimous action of Kami and S & S, granted to Foreca, S.A. ("Foreca"), the Dutch manufacturer of the Ride,[6] a mortgage

---

3. Kami's exclusive right to manage and operate the Pier and Ocean Block was subject to a proviso requiring Kami to sell the Pier if, by September 30, 1988, a buyer were found who was willing to purchase the Pier for at least $6 million. (App. at 947.)

4. In full, the indemnification provision provided:

 [S & S] each hereby agree to indemnify and hold Kami harmless from and against all claims, losses, causes of action, and damages of any kind or description whatsoever, including counsel fees, arising out [of] or relating to the operation of [their properties]. Kami hereby agrees to indemnify and hold [S & S] harmless from and against all claims[,] any losses, causes of action, and damages of any kind or description whatsoever, including counsel fees, arising out of or relating to the operation of the Pier and Ocean Block properties.

 (App. at 951.)

5. In its brief, the Debtor claims that "[t]here is absolutely no evidence in the record that Kami sought or the other partners gave their permission to the erection of the [Ride] on [the Pier]."

(Appellant's Br. at 33 n. 36, 37.) This assertion is clearly without merit as it is directly contradicted by Silverman's own testimony at the bankruptcy court hearings:

 After the summer [Kami] told Mr. Stein and myself that the only way he could make these payments [was] if he erected a roller coaster. And *we gave him permission to erect the roller coaster* in the hope that he would generate sufficient money so he could meet his obligations under the October 18th agreement.

(App. at 89) (emphasis added). Accordingly, Judge Scholl's finding that S & S expressly granted Kami permission to erect the Ride is not clearly erroneous.

6. The record appears to indicate that another foreign company, Vekoma, was in fact the manufacturer of the Ride, and that Foreca was a finance company engaged in the business of financing the purchase of amusement rides and related equipment. (Appellant's Br. at 8–9; App. at 89, 607.) In any event, any confusion as to which company manufactured the Ride is immaterial to the court's resolution of the issues presented.

on the Pier and the Ocean Block as additional security for the Ride. The form of the agreement was that Foreca would continue to own the Ride and would lease it to Kami. S & S, as well as Kami, signed the Foreca mortgage on behalf of the Debtor. *Id.*

In mid-March, 1989, Kami first met with George Baumgardner, the principal and sole shareholder of the Company, to discuss the erection of the Ride ("the Ride Project"). Initial negotiations between Kami and Baumgardner contemplated the retention of the Company as a contractor. Eventually, however, they reached an agreement whereby Kami would supply the requisite labor, materials, and sub-contractors required for the Ride Project and the Company would act as the Ride Project's construction manager, supervising and coordinating the activities of the sub-contractors hired and paid by Kami, rather than as a contractor. Pursuant to this agreement, for a fee of $75,000.00, the Company would both manage the Ride Project and, where necessary, perform construction services with its own labor and materials. Any monies expended by the Company for materials and supplies were to be reimbursed at cost plus an additional fifteen percent (15%). The Company was to be paid on a weekly basis and construction was to begin immediately so that the Ride Project could be completed by July 4, 1989, when the 1989 summer season would be at its height.

From the outset of the Ride Project, the Company assumed responsibilities in excess of the scope of its original agreement with Kami. In addition to its supervisory role, the Company began to provide workers and materials. Sometime in the middle or latter part of April, Kami indicated to Baumgardner that he was out of money and that the sub-contractors were threatening to leave the Ride Project. Kami requested that the Company assume payments to the sub-contractors for a short period until he could refund the Company for the money it expended. In order that the Ride Project might continue and be completed by the crucial July 4th weekend, Baumgardner reluctantly agreed that the Company would pay the sub-con-

tractors for a short period of time. Ultimately, the Company paid the sub-contractors approximately $550,000.00 over the remainder of the Ride Project.

At about the same time that the Company agreed to assume payments to the sub-contractors, Kami had begun to fall behind on his weekly payments to the Company. In late April, after a check to the Company was dishonored, Baumgardner demanded that Kami pledge additional security for the Company's continued performance. Ultimately, Kami and a wholly-owned company of his, Zebra Diamond Co. ("Zebra"), agreed to grant the Company a third mortgage on property known as the Nilon Pier in the amount of $750,000.00 in order to prevent the Company's withdrawal from the Ride Project. The Nilon Pier property was encumbered by two prior mortgages in the total amount of no more than $4 million at the time the Company took its mortgage.

The Ride was completed on schedule and opened for the July 4th weekend. By a letter dated July 12, 1989, which enclosed final invoices, the Company advised Kami that he owed the Company $944,179.71. The Company was unable to obtain this amount from Kami. Sometime in July, 1989, shortly after the Ride was completed and opened to the public, Kami defaulted on the Company's Nilon Pier mortgage as well as on the first and second mortgages on the property. In August, 1989, the Company initiated foreclosure proceedings on the Nilon Pier property and took title to it by a deed in lieu of foreclosure in October, 1991. The first mortgagee subsequently foreclosed upon the Nilon Pier as well, and it was bought by a third party in February, 1993 for approximately $3 million. In the face of the first mortgagee's subsequent foreclosure, the Company retained no further interest in the property and realized no financial gain from its sale.

The Company filed the Claim on August 12, 1992.[7] After conducting hearings on the matter, Judge Scholl allowed the Company a general unsecured claim in the amount of

---

7. The Debtor initiated bankruptcy proceedings on October 23, 1991. The history of those proceedings through July, 1992 is recounted in some detail in *Hunt I* at 39–41.

$1,089,029.00 [8] against the Debtor, finding that the Debtor as a partnership was liable to the Company for the debt incurred by Kami. The Debtor's main contention on appeal is that the Judge Scholl erred in allowing the Company's Claim because Kami did not have the authority to bind the Debtor to a contract with the Company. Alternately, the Debtor contends that the Company's foreclosure on the Nilon Pier should have precluded its Claim.

### STANDARD OF REVIEW

 In an appeal from a bankruptcy court decision, the district court sits as an appellate court and has plenary review of conclusions of law, but may not set aside a bankruptcy judge's findings of fact unless they are clearly erroneous. *See Century Glove, Inc. v. First American Bank of New York*, 860 F.2d 94, 100 (3d Cir.1988).

### DISCUSSION

#### I.

The Debtor's first contention is that the Letter Agreements effectuated a dissolution of the Debtor. Hence, the Debtor argues, after the effective date of the Letter Agreements the general agency relationship that arises out of a partnership was terminated, and Kami no longer had any authority to bind the Debtor to a contract with the Company. The Debtor correctly states that, under New Jersey law, "[e]xcept so far as may be necessary to wind up partnership affairs or to complete transactions begun but not then finished, dissolution terminates all authority of any partner to act for the partnership." N.J.S.A. § 42:1–33.[9]

 This principle is not in doubt. If the Letter Agreements dissolved the Debtor, then Kami indeed had no general authority

to bind the Debtor to the contract with the Company. However, the Debtor's foray into the effects of dissolution misses the point. Judge Scholl did not, as the Debtor implies, err by misapplying the law regarding the effect of dissolution. Rather, he found that the Letter Agreements did not immediately dissolve the Debtor as of their effective date, and thus Kami was still capable of acting as an agent of the Debtor when he contracted with the Company in 1989. Specifically, Judge Scholl held:

> [B]y the terms of the October Letter, it was only as of April 1, 1991, that the Debtor would be dissolved and, *at that time*, Kami would not be able to act on behalf of the Debtor. Therefore, at the time that he was negotiating with the Company, Kami was capable of acting on behalf of the Debtor.

*Hunt II* at 446 (emphasis in original). For reasons discussed below, the court agrees with this determination.

At the outset, the court notes that the plain language of the Letter Agreements clearly evinces an intent not to dissolve the Debtor until April 1, 1991. The opening paragraph of the July Agreement states that the "purpose of this letter is to set forth in writing ... the terms and conditions under which the partnership is to be restructured and *ultimately dissolved.*" (App. at 942) (emphasis added). The October Agreement did not retain that exact language, but is nevertheless replete with statements to the effect that the Debtor would not be dissolved until some future date.[10] And finally, both the July and October Agreements contain the following language: *"The term of the partnership shall continue until April 1, 1991, at which time the partnership shall be dis-*

---

**8.** There is no dispute as to the amount of the Claim.

**9.** New Jersey has adopted the Uniform Partnership Act. N.J.S.A. §§ 42:1–1 to 42:1–43. There is no dispute that New Jersey law governs this action. *See Hunt I* at 41; *Hunt II* at 446.

**10.** *See, e.g.,* App. at 961 ("*If there is a dissolution of the partnership prior to February 27, 1991 ...* then the indebtedness referred to in this para-

graph [Kami owed S & S approximately $300,-000.00 for loans they had previously made to the partnership] shall become payable at that time") (emphasis added); *id.* at 960–61 (discussing the "net economic benefits and risks to be shared during the *balance of the term of the partnership*") (emphasis added). The October Agreement also clearly contemplated that subsequent to its execution the parties would prepare an "amended and restated partnership agreement." *Id.* at 962.

*solved....*" (App. at 951, 963) (emphasis added).

■ The Debtor now contends that Judge Scholl erred when he gave effect to the explicit and unambiguous language of the above clause of the Letter Agreements. According to the Debtor, the partners mistakenly used the term "dissolution" instead of the term "termination." (Appellant's Br. at 22.) The Debtor claims that this "mistake" was at worst inaccurate and that Judge Scholl's finding, entirely consistent with the Letter Agreements' clear language, that the Debtor was not to be dissolved until April 1, 1991, somehow "elevates form over substance." *Id.* Although "dissolution" and "termination" are indeed distinct concepts in the context of partnership law, *see, e.g.,* N.J.S.A. §§ 42:1–29, 42:1–30, and the distinction between the two terms and their concomitant legal consequences is at times misunderstood and confused, (*see* Appellant's Reply Br. at 15), the court nevertheless finds the Debtor's contention that it mistakenly used "dissolution" instead of "termination" unpersuasive. Indeed, given the fact that the drafter of the Agreements was an attorney and both Silverman and Stein were attorneys, it borders on the ludicrous.

As noted above, the reference to "dissolution" on April 1, 1991 in both the July and October Agreements was not an isolated "mistake," but wholly consistent with the entire documents. When the partners amended the July Agreement with the October Agreement, they had an opportunity to correct any inadvertent use of "dissolution" instead of "termination" in the July Agreement, yet they declined to do so. Moreover, both the July and the October Agreements contained a paragraph which stated in part: "Each of the parties to this letter agreement acknowledges, recognizes and agrees that each has had an ample opportunity to review this agreement, they are satisfied with its terms and conditions and intend to be bound by its terms." (App. at 951, 963.)

In its Reply Brief, the Debtor retreats from sole reliance on the theory that the use

of "dissolution" in the Letter Agreements was a mistake. Instead, the Debtor asserts that contracts in New Jersey are not interpreted according to their "plain language" and asks the court to look to the intent of the partners in entering into the Letter Agreements. According to the New Jersey Supreme Court, the polestar of contract interpretation is to discover the intention of the parties to a contract, and individual interpretative rules should be subordinated to that goal. *Kearny PBA Local No. 21 v. Town of Kearny,* 81 N.J. 208, 405 A.2d 393, 400 (1979); *see also J.L. Davis & Associates v. Heidler,* 263 N.J.Super. 264, 622 A.2d 923, 925 (1993). However, "where the terms of a contract are clear and unambiguous there is no room for interpretation or construction and the courts must enforce those terms as written." *Heidler,* 622 A.2d at 926 (citations omitted).

It is difficult to conceive that the explicit language in the Letter Agreements regarding dissolution—i.e., that "[t]he term of the partnership shall continue until April 1, 1991, at which time the partnership shall be dissolved"—is anything but clear and unambiguous. Nevertheless, even if the court were to ignore this clear and unambiguous language, it still finds that the partners did not intend that the Letter Agreements would immediately dissolve the Debtor.

In its Brief, the Debtor explains that although Kami and S & S no longer wanted to conduct business with each other as a partnership, they maintained the partnership in form because termination of the partnership would have violated certain provisions of the AFF Loan and would have required the Debtor to immediately repay the outstanding balance.[11] (Appellant's Br. at 4.) In essence, the partners wanted to cease doing business as a partnership but yet avoid defaulting on the AFF loan. *Id.* According to the Debtor, in order to achieve this goal, the partners intended, by the Letter Agreements, to dissolve the partnership but not to terminate it until the AFF loan had matured.

---

11. The specific terms of the AFF Loan were neither contained in the record nor provided by

the Debtor in its appendix.

(*Id.* at 4–5; *see also* Appellant's Reply Br. at 4.)

Throughout its briefs the Debtor consistently refers to the Letter Agreements collectively as the "Dissolution Agreement," although there is no evidence that the Agreements were ever titled or referred to as such when written and approved by the partners. In fact, the October Agreement is captioned "Hunt's Pier Associates/Amended and Restated Agreement of July 8, 1988." (App. at 954.) Moreover, both documents are referred to in their texts as a "letter agreement." (*See, e.g.,* App. at 951, 963.) Furthermore, in February, 1990 the Debtor filed an answer and crossclaim in a New Jersey state court action brought by the Company in which the Debtor stated that following the withdrawal of Snyder, the remaining partners (Kami and S & S) "entered into an amended and restated Partnership Agreement." (App. at 879, ¶ 37.) The Debtor's disingenuous designation of the Letter Agreements as the "Dissolution Agreement" in its appeal is thus obviously entitled to no weight in assessing the intent of the partners.

Moreover, the Debtor's contentions regarding the intent of the partners are almost entirely unsubstantiated. Specifically, the Debtor points to no evidence in the record that supports its claim that the partners wanted to *dissolve but not terminate* the Debtor in order to avoid immediate repayment of the outstanding balance on the AFF loan.[12] The court views this contention with skepticism in light of the fact that the partners did not express their intention to dissolve but not terminate the Debtor in the Letter Agreements. If, as the Debtor now

contends, the partners intended to dissolve but not terminate the Debtor, it is difficult to conceive that they would not have properly utilized those terms in the Letter Agreements in light of their understanding of the distinction between the two terms. The court cannot fathom why the partners would have agreed to be bound by a document whose terms were so contrary to the parties purported intent. It certainly strains credulity to believe that Stein and Silverman, both attorneys, would have agreed to be bound by a document that consistently refers to dissolution only as a future occurrence and makes no mention of termination whatsoever if they had intended to immediately dissolve but not terminate the Debtor.[13]

Additionally, although the Debtor contends that the only evidence in the record regarding the partners' intent was the testimony of Silverman that the partners intended to dissolve the Debtor when they entered into the Letter Agreements, *see supra* n. 12, a closer examination of the record reveals other testimony of Silverman that contradicts this position. For example, he originally testified that the October Agreement was a "restated partnership agreement." (App. at 86.) And he also testified that both the July and the October Agreements continued the Debtor as a New Jersey general partnership. (App. at 115–16.)

■ The Debtor also assigns great weight to the section of the Letter Agreements that provides that neither Kami nor S & S may incur any indebtedness for which the other will be liable, arguing that such a provision clearly demonstrates an intent to dissolve the partnership.[14] However, upon close scrutiny

---

**12.** Silverman did testify that the partners intended to dissolve the Debtor by the Letter Agreements. He did not, however, testify—as the Debtor implies in its Reply Brief—that the intent of the Letter Agreements was to dissolve but not terminate the Debtor in order to avoid default on the AFF Loan. (*See* Appellant's Reply Br. at 7; App. at 436–38.)

**13.** The court earlier rejected the Debtor's argument that it mistakenly used "dissolution" instead of "termination" in the Letter Agreements. The Debtor's contention that the partners intended to dissolve but not terminate the partnership by the Letter Agreements would certainly sup-

port a conclusion that the partners and/or their counsel understood the distinction between the two terms and only further damages the credibility of its "mistaken-use-of-dissolution" argument.

**14.** The Debtor also vigorously contests the view, adopted by both Judge Scholl and the Company, that this provision merely prevented either Kami or S & S from incurring a debt for which the other would be personally liable, but did not prohibit either from incurring a debt for which the partnership would be liable. The Debtor's contentions in this regard are addressed *infra* at 453–54.

of the pertinent section, the court cannot agree with that conclusion. In full, the provision in question provides that:

> After the close of business, July 7, 1988, neither Messrs. Stein nor Silverman nor Kami shall incur any indebtedness for which the other (or the respective properties allocated to them under this Letter Agreement) will be liable in connection with the operation of their respective properties. *It is the intention of the parties* in this regard that even though the partnership will be maintained in existence until dissolved as set forth below, the practical operation of the partnership's assets and all risk of loss and potential for profit therefrom shall be treated as though there had been an in kind distribution of the partnership's assets ... and that the net economic benefits and risks to be shared during the balance of the term of the partnership will be allocated on the books of the partnership in a manner that would give the same effect as though the partnership had been now dissolved....

(App. at 948–49, 960–61) (emphasis added).

The Company contends that the Letter Agreements did not dissolve the Debtor but instead provided for an internal reallocation of profits, losses and management responsibilities among the three remaining partners, Kami and S & S, after Snyder's withdrawal from the partnership. In light of the above specific statement of the partners' intention embodied in the October Agreement itself, the court agrees. *See* Restatement (Second) of Contracts § 212 cmt. b (1979) ("the words of an ... agreement remain the most important evidence of intention").

The section of the October Agreement quoted above clearly states that the partners intended that "the net economic benefits and risks to be shared [among the partners] during the balance of the term of the partnership will be allocated on the books of the partnership in a manner that would give the same effect *as though* the partnership had been now dissolved...." (App. at 960–61) (emphasis added). At the bankruptcy court hearings, Silverman himself testified that

"the actual *purpose* of the [July Agreement] was to have an *internal allocation* amongst the partners of assets of the partnership." (App. at 114) (emphasis added). He also referred to the structure of the partnership as "an *inter se* dissolution [with] the various assets of the partnership ... allocated to each partner." (App. at 438) (emphasis added).

■ The Letter Agreements may be viewed as an attempt by the partners to preserve the partnership in form while at the same time internally allocating partnership assets, liabilities and management responsibilities among the partners in a manner *as if* the partnership had been dissolved and its assets distributed. Nevertheless, the court cannot escape the conclusion, evidenced by both the stated intent of the partners embodied in the October Agreement and by Silverman's testimony, that although the Letter Agreements may have internally re-allocated the Debtor's assets, liabilities, and management responsibilities among the partners, they did not alter the status of the Debtor in relation to third parties.

■ Finally, because the partners' conduct subsequent to the effective date of the October Agreement also supports a conclusion that the Letter Agreements did not immediately dissolve the Debtor, the court will examine this conduct. As noted earlier, under the Uniform Partnership Act, a partnership is not terminated upon dissolution but continues until the completion of the winding up of partnership affairs. N.J.S.A. § 42:1–30. According to the Debtor, the discontinuation of a partnership is a three-part process consisting of dissolution, followed by a winding-up of the business activities of a partnership, and concluding with the termination of the existence of the partnership. (Appellants's Br. at 15.) The Debtor contends that: "'[d]issolution' is a legal term of art referring to the *decision* to wind down and terminate a partnership. It does *not* refer to the subsequent steps of winding down and actually terminating the partnership's existence." *Id.* at 16 (emphasis in original).[15] Without

---

15. In its Reply Brief, the Debtor cites *Lewis v. Rostan*, 199 F.Supp. 129, 131 (E.D.Pa.1961), for the proposition that "a dissolution agreement effectuates a dissolution as soon as it is executed,

passing on the accuracy of this assertion, the court notes that the actions taken by Kami and S & S after the effective date of the October Agreement were neither in furtherance of the winding up of the Debtor's affairs nor indicative of a partnership that had been dissolved.[16]

█ The Debtor itself contends that the contract between Kami and the Company was not in furtherance of the winding up of the affairs of the Debtor. (Appellant's Br. at 23–25; *see also* Appellant's Reply Br. at 17.) As noted above, Judge Scholl found, and the finding was not clearly erroneous, that S & S explicitly granted Kami permission to erect the Ride on the Pier. The contract with the Company was clearly executed in furtherance of the erection of the Ride. *See Hunt II* at 446. In effect then, S & S authorized the conduct which the Debtor now contends was not in furtherance of the winding up of its affairs.

The court recognizes that the Debtor makes this contention only in the context of N.J.S.A. § 42:1–35(1)(a), an exception to the general rule that dissolution terminates the authority of a partner to act for the partnership. This section provides that "[a]fter dis-

solution a partner can bind the partnership . . . [b]y any act appropriate for winding up partnership affairs or completing transactions unfinished at dissolution." N.J.S.A. § 42:1–35(1)(a). Consequently, the Debtor contends that it cannot be bound by Kami's contract with the Company because such contract was not in furtherance of the winding up of partnership affairs. Such an argument cannot succeed, however, because it rests upon the flawed assumption that the Letter Agreements had already dissolved the Debtor and contradicts the Debtor's prior arguments.

In an attempt to evade the unambiguous language of the Letter Agreements regarding dissolution, the Debtor first asked the court to ignore the allegedly mistaken designation of "termination" as "dissolution" therein and instead to focus on "the nature of the transaction itself" rather than the "label that is used to describe it," (Appellant's Br. at 22 n. 24), and the intent of the partners. The Debtor now, in essence, asks the court to evaluate the partners' conduct regarding the construction of the Ride as if it were clear that the Debtor had already been dissolved by the Letter Agreements. The Debtor simply cannot ask the court to first ignore the

---

even if the parties carry out *none* of the terms of the dissolution agreement." (Appellant's Reply Br. at 11) (emphasis in original). *Lewis* cannot, however, be read so broadly.

In *Lewis,* the partners had signed an agreement of dissolution and distribution. One day after signing the agreement, the plaintiff partner renounced the agreement. The court in *Lewis* found that, although the terms of the agreement had not been carried out by either the plaintiff or defendants, the agreement had not been rescinded by the mutual consent of the parties and the partnership in question had been dissolved when the partners signed the agreement. 199 F.Supp. at 130–31. Contrary to the Debtor's contention, *Lewis* did not announce a general rule that a dissolution agreement effectuates a dissolution as soon as it is executed, even if the parties carry out none of the terms of such agreement. Moreover, in *Lewis,* the controversy presented revolved not around whether the agreement in question provided for the immediate dissolution of the partnership but rather whether the partners were bound by the agreement in light of one partner's renunciation of it.

Furthermore, to be clear, the court is not ruling that the Letter Agreements did not dissolve the Debtor merely because the partners did not immediately take action to wind up the Debtor's

affairs after the effective date of the Agreements. Rather, the court notes only that the conduct of the partners subsequent to their ratification of the Letter Agreements supports its determination that the Letter Agreements did not immediately dissolve the Debtor.

**16.** In its Reply Brief, the Debtor cites several cases in support of its contention that subsequent to the Letter Agreements, it no longer had any attributes of an ongoing partnership. (Appellant's Reply Br. at 9.) All of the cases cited are clearly inapposite, however, as they involved attempts to infer a partnership from the conduct of the parties where no express partnership agreement existed rather than an analysis of whether a clearly established partnership had been dissolved. For example, *Kozlowski v. Kozlowski,* 164 N.J.Super. 162, 395 A.2d 913 (1978), *aff'd,* 80 N.J. 378, 403 A.2d 902 (1979), involved a situation where the plaintiff sued a man she had cohabitated with for fifteen years for a share of his assets accumulated during that time on the theory that they had formed a partnership. In that case, as well as the others, the criteria cited by the Debtor were utilized to evaluate whether a partnership had in fact ever been created rather than whether a clearly established partnership had been dissolved.

meaning of the term "dissolution" in the Letter Agreements and focus on "the nature of the transaction" and the intent of the partners instead, and then turn around and pretend that the acts of the partners have no bearing upon ascertaining their intent and no consequences regarding the determination of whether or not the Debtor was in fact dissolved by the Letter Agreements.

The Debtor, through S & S, expressly authorized Kami to erect the Ride and now contends that the contract with the Company to erect the Ride was not in furtherance of winding up the affairs of the Debtor. The Debtor disputes that it gave Kami permission to erect the Ride, claiming that all it consented to was the granting of a mortgage lien on the Ocean Block and the Pier to secure Kami's personal obligations to Foreca. (Appellant's Br. at 33 n. 36, 37–38.) As discussed previously, the court is more than adequately convinced that Judge Scholl's finding that the Debtor expressly granted Kami permission to erect the Ride is not clearly erroneous, *see supra* n. 5, and it will not revisit that issue here. In the present context, however, two documents executed by the Debtor in connection with the granting of the mortgage lien are highly relevant because they demonstrate that the Letter Agreements did not immediately dissolve the Debtor.

In connection with the granting of the mortgage lien, and a related guaranty by the Debtor, the Debtor executed two documents on February 17, 1989—a Certificate of Hunt's Pier Associates and a Partnership Resolution. (App. at 729, 742.) The Certificate states "[e]ach of the Mortgage of the Partnership and the Guaranty of the Partnership in favor of Foreca, S.A. ... is the legal valid and binding obligation of the Partnership...." (App. at 729.) The Resolution states that the Debtor's mortgage agreement with Foreca "does not violate the terms of the general Partnership Agreement of the Partnership and that the Partnership ... [intends] to be legally bound thereby." (App. at 742.) Both of these documents clearly bound the Debtor as a partnership to obligations related to an activity—the acquisition of the Ride—which the Debtor contends was not in furtherance of the winding up of the partnership. Most pertinently, these documents bound the Debtor to new obligations not in furtherance of winding up partnership affairs after the effective date of the Letter Agreements. Hence, at a time subsequent to the date on which the Debtor alleges it was dissolved, the Debtor bound itself to new obligations not consistent with winding up its affairs and represented to outsiders that it was a general partnership. Such conduct cannot be squared with a contention that the Letter Agreements immediately dissolved the Debtor.

In summary, the Debtor has failed to establish that the Letter Agreements provided for the immediate dissolution of the partnership. The unambiguous language of the Agreements clearly states that dissolution was not to occur until April 1, 1991, and the Debtor's contention that the partners mistakenly used the term "dissolution" in place of "termination" throughout the agreements is without merit. The Debtor's assertions regarding the partners' intent are at best ambiguous and contradicted by highly relevant portions of the record. Moreover, the conduct of the partners subsequent to their ratification of the Letter Agreements only buttresses a conclusion that the Agreements did not immediately dissolve the Debtor. Accordingly, the court is convinced that Judge Scholl was not only not clearly erroneous but was clearly not erroneous when he found that the Letter Agreements had not dissolved the Debtor as of the spring of 1989 and that Kami was thus capable of acting as the Debtor's agent when he contracted with the Company.

## II.

■ The Debtor alternately contends that even if the Letter Agreements did not dissolve the partnership, Kami nevertheless had no authority under the Letter Agreements to bind the Debtor to a contract with the Company. Both Agreements provided that:

> [N]either Messrs. Stein nor Silverman nor Kami shall incur any indebtedness for which the other (or the respective properties allocated to them under this Letter Agreement) will be liable in connection

with the operation of their respective properties.

(App. at 948, 960.) According to Judge Scholl, this provision prohibited the partners from incurring any obligation or indebtedness for which the others would be individually liable, but did not prohibit them from incurring such obligations or indebtedness on behalf of the partnership. *Hunt II* at 445–46. The Debtor disputes Judge Scholl's interpretation of the provision, contending that it ignores the basic tenet of partnership law that partners are jointly and severally liable for partnership debt, *see* N.J.S.A. § 42:1–15, and thus violates an elementary principle of contract interpretation under New Jersey law because, by creating an illusory distinction between individual partner liability and partnership liability, it deprives the provision of any meaning. (Appellant's Reply Br. at 12–14.) Although the court disagrees with Judge Scholl's interpretation, it concurs with the result he reached. For, as explained below, even assuming that the provision in question did prohibit Kami from incurring partnership debt, the Debtor is nevertheless still liable to a third party such as the Company for a partnership debt incurred by Kami in violation of that provision.

■ Under New Jersey law, "[e]very partner is an agent of the partnership for the purposes of its business...." N.J.S.A. § 42:1–9(1); *accord Eule v. Eule Motor Sales,* 34 N.J. 537, 170 A.2d 241, 243 (1961). As a general agent of the partnership,[17] Kami's power to bind the Debtor to the contract with the Company is likewise defined by the New Jersey Uniform Partnership Law which provides that:

[T]he act of every partner, including the execution in the partnership name of any instrument, for apparently carrying on in the usual way the business of the partnership of which he is a member binds the partnership, unless the partner so acting has in fact no authority to act for the partnership in the particular manner, and the person with whom he is dealing has knowledge of the fact that he has no such authority.

N.J.S.A. § 42:1–9(1).

Judge Scholl determined that the transaction with the Company occurred in the "usual way" of carrying on the Debtor's business, noting that the installation of rides "in order to generate revenue from customers' patronage of the rides" was within the "usual way" for an amusement pier to do business. *Hunt II* at 446. The Debtor disputes this finding, contending that the erection of the Ride was not usual to its business because projects of such a scope and magnitude were not a common occurrence in its business. (*See* Appellant's Br. at 32–39.) Specifically, the Debtor asserts that "[w]hat is ordinary and usual for apparently carrying on the business of the [Debtor] is the operation of amusement rides on the amusement pier, not the acquisition and erection of one of the largest roller coasters on the East Coast." *Id.* at 36.

■ The court finds the Debtor's position unpersuasive. In this instance, the court is not faced with a situation involving a transaction wholly unrelated to the business of an amusement pier. The acquisition and erection of a roller coaster is manifestly consistent with the ownership and operation of an amusement pier. The court is not convinced that merely because the roller coaster was quite large and its construction a major undertaking, its acquisition and erection were therefore not "usual" to the Debtor's business.[18] While the court can conceive of some circumstances where a transaction clearly related to the business of a partnership might

---

17. While the Letter Agreements may have circumscribed Kami's authority to act as the Debtor's agent, they did not terminate the general agency relationship inherent in a partnership because they did not immediately dissolve the Debtor. *See* N.J.S.A. §§ 42:1–9(1), 42:1–33.

18. Moreover, the Debtor offers no authority for this proposition. Although it does cite 3 Am. Jur.2d *Agency* § 85 (1986), (*see* Appellant's Br. at 38), that section of the treatise merely delineates general rules regarding the limitations upon a general agent's ability to bind its principal— including the rule that a general agent cannot bind its principal by transactions not in the ordinary or usual course of the principal's business. The cited section of the treatise does not, however, offer any specific support for the Debtor's contention that Kami was not acting in the usual course of the Debtor's business when he contracted with the Company.

nevertheless not be "usual" because it greatly exceeded the normal scope of such partnership's transactions, it finds the Debtor's position unavailing in light of Judge Scholl's finding that S & S expressly authorized the very project which they now contend was not usual to the Debtor's business. *Hunt II* at 440, 446.[19] Judge Scholl found that Kami's "transactions ... with the Company were 'usual' for the Debtor in the sense that they were necessary and foreseeable to effect Kami's expressly-authorized acquisition of the Ride," *Hunt II* at 448, and the court is satisfied that this finding was not clearly erroneous.

 Since the contract with the Company was "usual" to the Debtor's business, pursuant to N.J.S.A. § 42:1–9(1) the Debtor is bound by this contract unless Kami had no authority to act for the Debtor when he contracted with the Company, and the Company had knowledge of the fact that Kami had no such authority. As noted above, Judge Scholl found that Kami was authorized by S & S to erect the Ride. Nevertheless, Judge Scholl did find that Kami had deviated from the authorized scope of his authority under the Letter Agreements by "fail[ing] to make it clear to the Company that he was acting on behalf of himself or his own corporate entity and not the owner of the Pier, the Debtor." *Hunt II* at 448–49. Judge Scholl also found that Kami, in dealing with the Company, never "represent[ed] himself as a partner or agent of the Debtor," and that the Company had looked solely to Kami for payment and not to the Debtor. *Id.* at 447. Therefore, from the Company's "perspective, the Debtor was nothing more than an unknown and undisclosed principal of Kami."

*Id.* Accordingly, Judge Scholl found that Kami's deviation from the scope of his authority under the Letter Agreements was "neither knowable nor foreseeable" to the Company. *Id.* at 449.

 It thus appears that the requirements of N.J.S.A. § 42:1–9(1) have been satisfied, and the Debtor should be bound under partnership law by Kami's contract with the Company. Moreover, as Judge Scholl noted in his opinion, general principles of common-law agency also support a conclusion that the Debtor should be bound by Kami's contract with the Company.[20]

The rule in New Jersey regarding an undisclosed principal's liability for the acts of its agent has been described thusly:

> Under familiar principles of agency law, .... [i]f the agent does not disclose his principal and purports to be acting for himself, the third person, upon ascertaining the principal-agent relationship, ... may elect to hold the agent personally liable, *or* he may sue the principal.

*Moss v. Jones,* 93 N.J.Super. 179, 225 A.2d 369, 371 (1966) (emphasis in original). *See also Greenberg v. Palmieri,* 71 N.J.L. 83, 58 A. 297, 298 (1904); 3 Am.Jur.2d *Agency* § 322 at 829 (1986) ("a general agent or manager may subject his [undisclosed] principal to liability for acts done contrary to his instruction where the acts are usual or necessary in such a transaction"). Additionally, Judge Scholl found that sections 194 and 195 of the Restatement (Second) of Agency supported a conclusion that the Debtor should be bound by Kami's contract with the Company.[21]

---

**19.** As previously discussed, the court rejects the Debtor's contention that S & S did not authorize the construction of the Ride. *See supra* n. 5.

**20.** Regarding the interplay between agency and partnership and the distinctions between an agent and a partner, the Restatement (Second) of Agency has noted:

> [T]he rights and liabilities of partners with respect to each other and to third persons are largely determined by agency principles. [Where] a partner is a general agent for the other members of the group, rules with reference to his liability and to the liability of the others because of his conduct both to third

persons and to the others are determined by the rules stated herein.

Restatement (Second) of Agency § 14A cmt. a (1958). *See also* N.J.S.A. § 42:1–4(3) ("The law of agency shall apply under this chapter").

**21.** Sections 194 and 195 provide in full:

> **§ 194. Acts of General Agents**
> A general agent for an undisclosed principal authorized to conduct transactions subjects his principal to liability for acts done on his account, if usual or necessary in such transactions, although forbidden by the principal to do them.
> **§ 195. Acts of Manager to be Owner**

The Debtor contends that Judge Scholl erred by relying upon sections 194 and 195 of the Restatement because he premised his conclusion upon the faulty assumption that Kami was an agent of the partnership. (Appellant's Br. at 29.)[22] According to the Debtor, the Letter Agreements provided that Kami would operate the Pier as an independent contractor and not as an agent of the Debtor. *Id.* Consequently, it alleges that Judge Scholl's "failure ... to differentiate between a partner acting as 'agent' for the [Debtor], and a partner operating an asset of the [Debtor] as an independent contractor was clearly in error." *Id.* at 30.

■ The pertinent provision of the Letter Agreements provides:

> As soon as possible, the parties shall cause partnership counsel to prepare a contract between the partnership and D & S Pier Company, Inc. for the operation, maintenance and insurance of the Pier on terms and conditions mutually agreeable to the parties, such that the Pier is then operated by D & S Pier Company, Inc. as an independent contractor.

(App. at 948, 960.) There is no evidence that a contract between the Debtor and D & S Pier Company, Inc. was ever executed or performed. In *Hunt I*, however, Judge Scholl did determine that upon execution of the October Agreement, Kami formed a corporation known as New Hunt's Pier Corporation ("the Corporation") and began to operate the Pier under that entity rather than under D & S Pier Company, Inc. as provided in the Letter Agreements. *Hunt I* at 41.

Most pertinently, Judge Scholl also determined that the Corporation formed by Kami *operated the Pier as an agent of the Debtor. Id.* at 46–47. Thus, rather than failing to differentiate between an agent and an independent contractor, Judge Scholl explicitly determined that Kami's corporation acted as the Debtor's agent.[23] Moreover, contrary to the Debtor's assertion that "[t]he converse of the principal and agent relationship is that of the independent contractor," (Appellant's Br. at 26–27), the two concepts are not mutually exclusive. *See* Restatement (Second) of Agency § 14N cmt. a (1958) (" 'independent contractor' is a term which is antithetical to the word 'servant' although not to the word 'agent' "); *see also id.* at § 2(3) (an independent contractor may or may not be an agent).

Finally, the Debtor contends that sections 194 and 195 cannot be utilized to impose liability on the Debtor because by their plain language those sections require that for an undisclosed principal to be liable for the acts of its agent, such acts must have been done on the principal's account. (Appellant's Br. at 30–31.) According to the Debtor, those sections are thus inapplicable in this case because, per the Letter Agreements, Kami was to receive 100% of the profits and losses arising from the operation of the Pier. *Id.* Contrary to the Debtor's position that it received no benefit from Kami's contract with the Debtor and the contract was thus not done on its account, the Company contends that the Debtor did receive a benefit because income produced by the Ride was

---

> An undisclosed principal who entrusts an agent with the management of his business is subject to liability to third persons with whom the agent enters into transactions usual in such businesses and on the principal's account, although contrary to the directions of the principal.

**22.** The Debtor also asserts that case-law interpreting those sections of the Restatement has limited their application to situations not present in this case. (Appellant's Br. at 31.) Two of the cases cited by the Debtor make no mention of sections 194 or 195 and the third cannot properly be said to stand for the proposition which the Debtor asserts. Moreover, one of the few recent cases which cites sections 194 and 195 makes no mention of those purported limitations and offers an interpretation of those sections consistent

with Judge Scholl's. *See Morris Oil Company, Inc. v. Rainbow Oilfield Trucking,* 106 N.M.App. 237, 741 P.2d 840, 843–44 (1987).

**23.** The court is well aware that Judge Scholl made these findings in the context of *Hunt I.* However, even apart from any principles of collateral estoppel which might be applicable, Judge Scholl explicitly incorporated his finding of agency in *Hunt I* into his opinion in *Hunt II. See Hunt II* at 449. Consequently, the Debtor's contention that Judge Scholl's finding in *Hunt I* that Kami operated the Pier under the name of his own corporate entity is "fundamentally inconsistent" with Judge Scholl's finding of agency in *Hunt II* is plainly without merit because it ignores his finding of agency in *Hunt I.* (*See* Appellant's Reply Br. at 7.)

utilized for partnership obligations such as real estate taxes, insurance, and maintenance of partnership property including the Pier. (Appellee's Brief at 12, 19, 24, 28.) Moreover, Judge Scholl found that "the Debtor benefitted directly from the Company's services by acquiring the installation of a large attraction on its pier." *Hunt II* at 449.

██ The Debtor disputes the Company's contention and Judge Scholl's finding, noting that Kami paid little or none of the partnership obligations to which the Company refers, (*see* Appellant's Reply Br. at 18 & n. 9), and that, although the Debtor may have assisted Kami in financing the acquisition of the Ride, the Ride remained Kami's personal property and was later removed from the Pier by Foreca. (*See* Appellant's Br. at n. 38.) In this regard, the court notes that although the Ride may indeed have been removed from the Pier by Foreca, 550 pilings which were installed by the Company during the course of the Ride's construction remain as a permanent improvement to the Pier. (*See* Appellee's Br. at 24.) Moreover, the court feels that the extent to which Kami used revenue generated from the Ride to pay partnership obligations such as insurance, real estate taxes, and maintenance is largely irrelevant. What it does find highly relevant, however, is the underlying rationale and motivation behind the acquisition and erection of the Ride.

██ The record is clear that Kami sought permission to erect the Ride because he was having difficulty paying his seventy-five percent (75%) share of the AFF Loan as required by the Letter Agreements, (*see* App. at 89); *see also Hunt II* at 440, 446, and that S & S gave him permission to erect the Ride with the hope that the Ride would enable the Pier to generate income sufficient for Kami to meet his share of the AFF Loan obligation. *Id.* Since the AFF Loan was a debt of the partnership, from a creditor such as AFF's perspective, whatever internal allocations the partners may have made among

themselves regarding repayment of this debt were irrelevant—if Kami's inability to pay his seventy-five percent (75%) share of the AFF Loan had caused a default under the Loan, the entire partnership would have been liable. And, as the Debtor has made abundantly clear, partners are jointly and severally liable for partnership debt. Thus, if Kami had failed to meet his obligations regarding the AFF Loan agreement, the Debtor (and by extension S & S individually as partners) would have been liable for that debt.

██ Although Kami was, as the Debtor contends, entitled to one-hundred percent (100%) of the profits and losses arising from the operation of the Pier, S & S gave Kami permission to acquire and erect the Ride with the hope that this would enable him to repay his portion of a debt for which the Debtor as a partnership (and thus by extension S & S as partners) was ultimately liable. (App. at 89.) A successful Ride would have helped Kami generate revenue to meet his internally allocated share of the AFF Loan, and would have consequently helped *the Debtor as a partnership* meet its obligations under the AFF Loan. In light of the above, the court cannot say that the contract with the Company—a natural consequence of the authorized acquisition of the Ride—was not entered into on the Debtor's account. Accordingly, for this reason and those previously stated above, the Debtor is bound by Kami's contract with the Company.

### III.

The Debtor's last argument is that Judge Scholl erred in determining that the Company's foreclosure on the Nilon Pier did not preclude its Claim. At the bankruptcy court hearings, the Debtor contended that the Company's foreclosure on the Nilon Pier precluded the Claim because such claim was in the nature of a request for a deficiency after a foreclosure.[24] Judge Scholl determined

---

24. Judge Scholl expressed skepticism regarding the Debtor's contention that the Claim was in the nature of a request for a deficiency, but nevertheless allowed the Debtor to present evidence in support of its argument that the Company's foreclosure on the Nilon Pier should preclude its

Claim. *Hunt II* at 444. Because the court agrees with Judge Scholl's ultimate determination that the Company's foreclosure did not preclude its Claim, it need not address the issue of whether or not the Claim is in actuality the

that the foreclosure did not preclude the Claim, and for reasons discussed below, the court agrees.

■ In New Jersey, to collect a debt secured by a mortgage on real property a mortgagee must first foreclose on the mortgage and thereafter, if the sale of the mortgaged premises in the foreclosure proceeding does not realize an amount sufficient to satisfy the mortgagor's debt, initiate a second action on the bond or note secured by the mortgage for any deficiency. N.J.S.A. 2A:50–2. In an action for a deficiency, the defendant may dispute the alleged amount due by introducing evidence as to the fair market value of the mortgaged property at the time of the foreclosure sale. N.J.S.A. 2A:50–3. In such cases the court determines the amount of the deficiency by crediting the fair market value of the property against the debt secured by the mortgage. *Id.*

■ This fair market value credit or "anti-deficiency" provision does not apply, however, to commercial property. N.J.S.A. 2A:50–2.3; *see also Citibank, N.A. v. Errico,* 251 N.J.Super. 236, 597 A.2d 1091, 1097 (1991) (N.J.S.A. 2A:50–2.3 exempts "mortgages secured by notes for business and commercial properties from the fair market credit provision").[25] Nevertheless, despite the exemption of business and commercial properties from the statutory anti-deficiency provision, "nothing ... precludes a court from applying equitable principles to impose a fair market value credit to prevent a windfall or where circumstances require equitable relief in the interests of justice." *Errico,* 597 A.2d at 1097 (citations omitted).

Relying primarily on *Errico,* the Debtor contends that Judge Scholl erroneously determined that the Debtor was entitled to no credit for the fair market value of the Nilon Pier at the time the Company obtained possession of the property by deed in lieu of foreclosure in October, 1991. According to the Debtor, based on the fair market value of the property at the time the Company took possession of it, the equity in the property beyond the two prior mortgages with which it was still encumbered was in excess of the amount of the Company's Claim and should have precluded such Claim.

■ The court initially notes that *Errico* merely permits rather than requires a court to consider fair market value credit in a deficiency proceeding involving commercial property. Unlike a deficiency action involving residential property where a consideration of fair market value is required by N.J.S.A. 2A:50–3, such consideration is not mandated in deficiency actions involving commercial property. *Errico,* 597 A.2d at 1097 ("Although N.J.S.A. 2A:50–2.3 [exempts] mortgages secured ... for business and commercial properties from the fair market credit provision, we find nothing which precludes a court from applying equitable principles to impose a fair market value credit") (citations omitted).

Judge Scholl accepted this interpretation of *Errico,*[26] but nevertheless found no inequities in the Company's actions and concluded that the Company's Claim was not precluded by the Company's foreclosure on the Nilon Pier. The Debtor contends that Judge Scholl erred because, in determining that the Company had suffered a deficiency and received no windfall from its foreclosure on the

---

equivalent of a deficiency proceeding after foreclosure.

**25.** In pertinent part, N.J.S.A. 2A:50–2.3 provides:
This act shall not apply to proceedings to collect a debt evidenced by a note and secured by a mortgage on real property in the following instances:
a. Where the debt secured is for a business or commercial purpose other than a two-family, three-family, or four-family residence in which the owner or his immediate family resides;
b. Where the mortgaged property is other than a two-family, three-family, or four-family

dwelling in which the owner or his immediate family resides at the time of the institution of proceedings to collect the debt;....

**26.** Judge Scholl also accepted, *arguendo,* the Debtor's assertion that equitable principles may be employed to preclude deficiency claims in instances involving foreclosures on junior mortgages. *Hunt II* at 450. Because this court agrees with Judge Scholl's ultimate conclusion that the Company's Claim is not precluded, it need not address the issue of whether equitable relief from a deficiency claim may be granted against a junior mortgagee.

Nilon Pier, he utilized the fair market value of the Nilon Pier as of December, 1992 rather than October, 1991 when the Company took title to the property by a deed in lieu of foreclosure. (Appellant's Br. at 42 n. 43.) Although N.J.S.A. 2A:50–3 does provide that fair market value in deficiency actions shall be determined as of the time the foreclosure sale, the Debtor's above contention misstates Judge Scholl's ruling and is without merit.

■ At the hearings, the Debtor's expert appraiser, John Simpson, testified that the fair market value of the Nilon Pier on October 1, 1991 was $8,890,000.00. *Hunt II* at 445. The Company's expert appraiser, Robert M. Sapio, testified that he had valued the property at $2,850,000.00 for Corestates Bank in December, 1992. *Id.* He also contended that the $3 million sale price realized at the sheriff's sale to a third party in February, 1993 was an accurate reflection of the property's present value. *Id.* In his opinion, Judge Scholl noted that he was "very skeptical of the accuracy of Simpson's" appraisal and that Sapio's appraisal "appears more likely to be accurate" because it was obtained in an engagement for Corestates—"a third party which had no bias in favor of any interested party in this controversy at that time." *Hunt II* at 450 & n. 3. However, contrary to the Debtor's contention, Judge Scholl did not err by determining the fair market value of the Nilon Pier as of December, 1992 rather than October, 1991.

Judge Scholl's opinion explicitly stated: "*Whatever the value of the Nilon Pier in October, 1991, . . .* the Company received no benefit from its foreclosure sale." *Hunt II* at 450 (emphasis added). His decision was predicated not upon a mistaken valuation of the Nilon Pier in December, 1992 instead of October, 1991 but rather upon the fact that the Company realized no windfall from the sale. *Errico* permits a court to "impose a fair market value credit *to prevent a windfall or where circumstances require equitable relief in the interests of justice,*" *Errico,* 597 A.2d at 1097 (emphasis added) (citations

omitted). Recognizing this principle, Judge Scholl refused to bar the Company's Claim in a situation, unlike the factual setting in *Errico,* where the Company not only received no windfall from the Nilon Pier but in fact reaped no benefit whatsoever from the property. *See Hunt II* at 450 ("Clearly, the Company has not received the windfall of reaping a profit from recovery of mortgaged property *and* a deficiency in addition in this factual setting. . . . [T]he Company, having no further interest in the Nilon Pier and thus far, no recovery from an elusive Kami or anyone else . . . has received no windfall") (emphasis in original).

■ Finally, the Debtor contends that because the Nilon Pier was worth between $5 million and $5.7 million (with a corresponding equity in excess of the amount of the Claim) based on the Company's own appraisal when it took title to the property in October, 1991,[27] the Company was seeking a windfall by pursuing its Claim. According to the Debtor, the Company held possession of the property for a significant amount of time before the first mortgagee foreclosed, and the Debtor should not be held responsible for the Company's failure to sell the property during that time. Appellant's Br. at 41–42; *see also* Appellant's Reply Br. at 20 ("by taking title to the pier, [the Company] assumed the risk that a real estate recession would occur, thus eliminating any equity in the pier"). The Debtor contends that if the value of the Nilon Pier had appreciated after the Company took title to it and the Company had been able to realize a profit on its sale in excess of the amount of its Claim, it would not have offered Kami or anyone else the excess amount. *Id.* The court must reject the Debtor's final argument for the following reasons:

Firstly, Judge Scholl found that any appraisal of the Nilon Pier's value obtained by the Company was tainted by faulty data supplied by Kami that grossly overstated the rentals due under the leases of his Nilon Pier's tenants. *See Hunt II* at 445, 450.

27. The court notes that the Company's appraisals to which the Debtor refers were obtained in the summers of 1989 and 1990 rather than immediately before the Company took title to the Nilon

Pier in October, 1991 as the Debtor implies in its brief. (*See* Appellant's Br. at 41; App. at 327–28, 855.)

Thus, although the Company may have taken title to the Nilon Pier in the mistaken belief that sufficient equity existed to satisfy the debt it was owed, such equity was not, as the Debtor alleges, eliminated by a depreciation in property value caused by a recession, but rather did not, in fact, exist when the Company took title to the property.[28] And secondly, Judge Scholl found "no credible evidence to support the conclusion that [the Company] should or could have remained the Nilon Pier's owner without an imprudent investment of capital on its part." *Hunt II* at 450. Neither of those determinations is clearly erroneous and the court will not second-guess Judge Scholl's findings. The Company did not receive a windfall in its disposition of the Nilon Pier and its Claim is hence not precluded.

## CONCLUSION

For all the reasons stated above, the decision of the bankruptcy court allowing the Company's Claim is AFFIRMED. An order follows.

## ORDER

AND NOW, this 20th day of December, 1993, the order of the bankruptcy court entered on May 20, 1993, allowing Proof of Claim No. 17 as an unsecured claim in the amount of $1,089,029.00, is HEREBY AFFIRMED. The Clerk of Court is directed to enter JUDGMENT for the appellee in accordance with this order.

---

**28.** The record reveals that Sapio testified that the fair market value of the Nilon Pier in October, 1991 when the Company took title to it was $2.95 million. (App. at 495.) If Sapio's testimony is credited—and Judge Scholl did find him more credible than the Debtor's appraiser, *see* *Hunt II* at 450 & n. 3, then the value of the Nilon Pier depreciated only $100,000.00 during the time in which the Company held title to it, and the property possessed no equity value in excess of its prior encumbrances when the Company took title to it.